**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: SOCIETY INSURANCE CO. | ) | |
| COVID-19 BUSINESS | ) | MDL No. 2964 |
| INTERRUPTION PROTECTION | ) | |
| INSURANCE LITIGATION | ) | Master Docket No. 20 C 5965 |
| | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| This Document Relates to the | ) | |
| Following Cases: | ) | |
| | ) | |
| VALLEY LODGE CORP., | ) | |
| Plaintiff, | ) | No. 20 C 02813 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, | ) | |
| a Mutual Company, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| RISING DOUGH, INC. (d/b/a | ) | |
| MADISON SOURDOUGH), *et al.* | ) | |
| individually and on behalf of all | ) | |
| others similarly situated, | ) | |
| Plaintiffs, | ) | No. 20 C 05981 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, | ) | |
| Defendant. | ) | |
| | ) | |
| BIG ONION TAVERN | ) | |
| GROUP, LLC, *et al.,* | ) | |
| Plaintiffs, | ) | No. 20 C 02005 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, INC., | ) | |
| Defendant. | ) | |

1

## MEMORANDUM OPINION AND ORDER

This multi-district litigation addresses Society Insurance's denials of business-income interruption coverage for a variety of restaurants (as well as other businesses in the hospitality industry) whose operations were affected by the COVID-19 pandemic. For the reasons detailed in this Opinion, Society's motion to dismiss the cases is granted.

## I. Procedural Background

After appointing counsel to lead the litigation on the Plaintiffs' behalf, and after conferring with the parties on which motions to decide as bellwethers, the Court picked three cases: *Big Onion Tavern Group, LLC, et al. v. Society Insurance*, No. 1:20-cv-02005; *Valley Lodge Corp. v. Society Insurance*, No. 1:20-cv-02813; and *Rising Dough, Inc. et al. v. Society Insurance*, No. 1:20-cv-05981. *See* R. 69. Society filed a motion to dismiss for failure to state a claim in the *Rising Dough* action, R. 19, No. 1:20-cv-05981, and a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment in the *Big Onion* and *Valley Lodge* actions. R. 112, No. 1:20-cv-02005; R. 16, No. 1:20-cv-02813.

By way of background, the Plaintiffs brought claims alleging coverage under a variety of Society's insurance-policy provisions, including coverages for the interruption of Business Income and, separately, for Civil Authority and Contamination. The Illinois-based Plaintiffs (in the *Big Onion* and *Valley Lodge* actions) also brought claims under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, for various "vexatious and unreasonable" insurance-claims practices. The substance of these

allegations is discussed in much greater detail in, among other orders, the prior opinion on the bellwether motions. R. 131 at 3–10. Society communicated the denial of the Plaintiffs' claims for coverage in several ways: preemptively, by circulating a memorandum to its insurance-agency partners on March 16, 2020, implying that its policies would not cover any pandemic-related claims; by denying individual claims filed by certain Plaintiffs; and in a March 27, 2020 memorandum to all policyholders declaring that "pandemic events" are generally excluded from insurance coverage. *See id.* at 8–10.

The Court denied, for the most part, Society's motions to dismiss and its alternative summary judgment motions. R. 131. The Court agreed with Society that the claims under the Civil Authority and Contamination coverages, as well as the Sue and Labor provision of Society's standard policy, could not proceed. *Id.* at 24–29. No civil authority had prohibited access to the premises nor to the immediate surrounding area, both of which were required to trigger Civil Authority coverage. *Id.* at 24–25. Nor had the Contamination coverage been triggered, because the limitation on the insureds' business operations was not caused by contamination of the premises (or equipment) *themselves* (and indeed, the insureds had continued to operate their businesses in limited form). *Id.* at 26–27. And the Sue and Labor provision was not even an independent basis for coverage, but instead set forth the steps that the insured had to take to mitigate losses and to track expenses. *Id.* at 28–29.

But the Court determined that the claims under the policy's Business Income coverage and Illinois Insurance Code Section 155 survived the motions. *Id.* at 12–24,

29–31. Each side then brought a motion following up on the summary judgment decision, seeking to consolidate and streamline the litigation. R. 152, Pls.' Mot. for Leave to File Master Cons. Am. Compl.; R. 175, Defs.' Mot. to Dismiss All Claims Premised upon Civil Authority/Contamination. The Court granted the Plaintiffs' motion in part and denied Society's motion as unnecessary, though the Court allowed further motion practice against the Master Consolidated Amended Complaint. R. 229, Memorandum Opinion and Order.

Afterwards, however, decisions in other cases interpreting similar (and indeed mostly identical) business-income coverage provisions were issued concluding that the key requirement for coverage—"direct physical loss"—was not satisfied by the mere loss of the use of the business premises. Instead, as detailed further below, the decisions almost uniformly held that there must be some physical *effect* or *alteration* to the insured property, not just a loss of its use. So Society moved to dismiss all of the actions against it.

## II. Analysis

### A. Standard of Review

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### B. Business Income Coverage

As relevant now, with the Business Income coverage as the sole remaining basis for coverage, Society renews the dismissal motion given the contrary weight of authority that has been issued since the initial opinion. Society is correct: the weight of authority, including state court opinions that bear on each of the state jurisdictions at issue in these cases, now demands dismissal.

Remember that the Business Income coverage arises from a specific part of the policies issued by Society: the Businessowners Special Property Coverage Form, section 5, Additional Coverages. Amongst the additional coverages is coverage for the loss of Business Income during a suspension of operations, and it reads as follows[1]:

**g. Business Income**

(1) Business Income

(a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss….

(b) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage.

The task of interpreting this Business Income coverage provision, like other interpretive endeavors on insurance policy-coverage questions, generally speaking can be resolved as a matter of law—if there are no textual ambiguities as applied to

---

[1]The text of the policies (including the Business Income coverage provision) is identical across all of the plaintiffs. R. 14, 20 C 5981, Exh. A; R. 1, 20 C 2813, Exh. B; R. 29, 20 C 2005, Exh. D.

the facts. *Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co.*, 139 F.3d 561, 565 (7th Cir. 1998) (applying Illinois law); *American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004) (applying Wisconsin law). Under Illinois law, absent ambiguity, insurance policies are given "their plain, ordinary meaning …." *Zurich Am. Ins. Co. v. Infrastructure Eng'g, Inc.*, 248 N.E.3d 1072, 1082 (Ill. 2024). And insurance policies are construed "as a whole," *id.* at 1082–83. The same principles apply under Wisconsin law: insurance-policy text is given its "common and ordinary meaning it would have in the mind of a lay person." *Secura Supreme Ins. Co. v. Estate of Huck*, 986 N.W.2d 810, 815 (Wisc. 2023) (cleaned up).[2] Also, "[i]f possible, a court should interpret a contract so that all parts are given meaning." *Id.* (quoting *Whirlpool Corp. v. Ziebert*, 539 N.W.2d 883, 886 (Wisc. 1995)). So too for Indiana, where insurance terms are given "their clear and ordinary meaning" absent ambiguity, *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005) (citing *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996)), and policy provisions are read together "to harmonize" them, "rather than place them in conflict." *Dunn*, 836 N.E.2d at 252.

The same two interpretive principles apply under Iowa law. Undefined insurance-policy terms take their "ordinary meaning." *Postell v. American Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012) (citing *Interstate Power Co. v. Ins. Co. of N. Am.*, 603 N.W.2d 751, 754 (Iowa 1999)). And, not surprisingly, the policy is construed

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

"as a whole." *Postell*, 823 N.W.2d at 41 (citing *Greenfield v. Cincinnati Ins. Co.,* 737 N.W.2d 112, 118 (Iowa 2007)). Minnesota applies the same tools of construction: policy terms are interpreted "as a whole, and unambiguous language must be given its plain and ordinary meaning." *Wesser v. State Farm Fire and Cas. Co.*, 989 N.W.2d 294, 299 (Minn. 2023) (quoting *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn. 1986)). Lastly, the same goes for Tennessee: "An insurance contract must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning." *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 306 (Tenn. 2007) (cleaned up) (citing *Naifeh v. Valley Forge Life Ins. Co.,* 204 S.W.3d 758, 768 (Tenn. 2006)). And "insurance policies should be construed as a whole in a reasonable and logical manner." *Moore & Assocs.*, 216 S.W.2d at 306 (cleaned up) (citing *Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.,* 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998)).

Returning to the specific policy here, the prior opinion in this case concluded that there was ambiguity in the key operative text of the Business Income coverage provision, R. 131 at 4–5 (quoting Business Income coverage provision), specifically whether the loss suffered by the policyholders was "caused" by "direct physical loss," Businessowners Special Property Coverage Form, A.3. The opinion reasoned that the coronavirus and the shutdown orders could be interpreted, by a reasonable jury, to be the "cause" of the loss of business income. R. 131 at 15–19. Likewise, the prior opinion held that, when viewed in the Plaintiffs' favor, a jury could conclude that the

8

businesses suffered a direct "physical" loss of property given the limits placed on their usage of each business' physical space. *Id.* at 19–23.

### 1. Illinois Law

But the weight of authority decided after the initial opinion dictates interpreting the key terms—loss caused by direct physical loss—as excluding the loss of income from the pandemic interruption. First amongst the controlling and pertinent authorities is *Sandy Point Dental, P.C. v. Cincinnati Insurance Company*, 20 F.4th 327, 331–34 (7th Cir. 2021). In *Sandy Point*, the Seventh Circuit concluded that, under Illinois law, the term "direct physical loss" in the applicable insurance policy required some "physical alteration to property" for coverage to apply. *Id.* at 332–33. The Seventh Circuit reasoned that the term "physical" required that the loss at issue "must be physical in nature" and must actually work an "alteration" to the property. *Id.* at 332. This interpretation does preclude from its scope the notion that the loss of physical space qualifies as a "physical loss," at this Court previously reasoned, R. 131 at 19–23. *Sandy Point* acknowledged that in past cases, some courts had held that a gas infiltration of business space "might cause loss of use without any accompanying physical alteration." 20 F.4th at 334. But the disruption in those cases went beyond mere "diminished ability to use the property" and instead was so "severe that it led to complete dispossession," which more readily fits as a "direct physical loss." *Id.* There—like here—though the businesses "preferred use" of the premises was partially limited, "other uses remained possible." *Id.* Absent rendering the property itself "completely uninhabitable," the coronavirus did not cause a "direct physical loss." *Id.*

Likewise, *Sandy Point* buttressed the interpretation of "direct physical loss" to require a physical alteration to property based on the "textual clue[]" that the time period of the business-income coverage lasts during the time when property is being "repaired, rebuilt, or replaced." 20 F.4th at 333 (emphasis omitted). The Seventh Circuit reasoned that "[w]ithout a physical alteration to property, there would be nothing to repair, rebuild, or replace." *Id.* This point, which gave the Court pause in the earlier decision, R. 131 at 22, also undermines the Court's prior reasoning: in Society's insurance policies, the definition of "Period of Restoration" says that coverage for loss of business income "ends on the earlier of" "the date when the property at the described premises should be *repaired, rebuilt[,] or replaced* with reasonable speed and similar quality; or the date when business is resumed at a new permanent location." Businessowners Special Property Coverage Form, A.5.g(1)(b); H.12 (emphasis added). The prior decision noted that the restoration defined the time period for coverage, rather than directly define what is a direct physical loss. R. 131 at 22–23. But the operative terms in the restoration period in Society's policies—repaired, rebuilt, replaced—mirror the terms at issue in *Sandy Point*, which means that they too are textual clues to defining direct physical loss as requiring a physical alteration to property.

With the fountainhead of *Sandy Point* in place for Illinois law, Illinois state appellate courts adopted the Seventh Circuit's reasoning. *State & 9 Street Corp. v. Society Ins.*, 2022 WL 2379361, at *8–9, 2022 IL App (1st) 211222-U, ¶¶ 36–39 (Ill. App. Ct. June 30, 2022) (unpublished order); *JCJ Rest. Co. v. Society Ins.*, 2022 WL

3581726, at *3, 2022 IL App (1st) 211225-U, ¶ 14 (Ill. App. Ct. Aug. 19, 2022) (unpublished order); *Lodge Mgmt. Corp. v. Society Ins.*, 2022 WL 4286341, at *3, 2022 IL App (1st) 211133-U, ¶ 14 (Ill. App. Ct. Sept. 16, 2022) (unpublished order). In trying to predict the Illinois Supreme Court's view on this issue, the Illinois Appellate Courts held that a direct physical loss must present a "physical alteration" of property. *E.g.*, *State & 9*, 2022 WL 2379361, at *9. Although the decisions were issued as unpublished orders under Illinois Supreme Court Rule 23(e), and thus did not have binding precedential effect (even on Illinois trial courts), still the decisions could be cited for "persuasive purposes." Ill. S. Ct. R. 23(e)(1). Given the uniformity of holdings and reasonings, there is no reason at this point to predict anything other than that the Illinois Supreme Court would require a physical alteration of property in order to qualify a loss as a "direct physical loss."[3]

The Seventh Circuit also followed suit for Michigan law in *Paradigm Care & Enrichment Center, LLC v. West Bend Mutual Insurance Company*, 33 F.4th 417, (7th Cir. 2022). *Paradigm Care* drew on Michigan Court of Appeals decision, as well as other circuit authority, to arrive at the same conclusion as *Sandy Point*: direct physical loss requires an alteration of property or complete dispossession of the business premises (that is, the loss of all uses for the premises). 33 F.4th at 421–22 (citing *Gavrilides Mgmt. Co. v. Mich. Ins. Co.*, .985 N.W.2d 919, 928–28 (Mich. Ct. App.

---

[3]Given the Seventh Circuit's express holding and discussion in *Sandy Point*, it is not surprising that the Seventh Circuit did not certify the question to the Illinois Supreme Court. Nor is this district court authorized to do so. Ill. S. Ct. Rule 20(a) (authorizing certification of questions only from the Supreme Court of the United States and the Seventh Circuit).

2022); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 403 (6th Cir. 2022); and *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 931–34 (4th Cir. 2022)).

## 2. Wisconsin Law

So too with the case law in the other States at issue in this MDL. First, the Supreme Court of Wisconsin held, in *Colectivo Coffee Roasters, Inc. v. Society Insurance*, 401 Wis.2d, 660, 671–74, 974 N.W.2d 442, 447–449 (2022), that the term "direct physical loss," though not defined in Society's policy, did require some degree of "tangible" harm to the property in light of prior Wisconsin precedent. 974 N.W.2d at 670–71. Just like *Sandy Point*, the Wisconsin high court also reasoned that the policy's reference to a restoration period cabined by the property being "repaired, rebuilt, or replaced" was a textual clue that the loss in question must "alter the property's tangible characteristics." *Id.* at 671. This definition would exclude, then, the mere loss of the business premises for its typical use, because no physical alteration had been inflicted on the property. *Id.* at 673.

## 3. Indiana Law

The same goes for Indiana case law. In *Indiana Repertory Theatre v. Cincinnati Casualty Company*, 180 N.E.3d 403, 410 (Ind. Ct. App. 2022), the Court of Appeals of Indiana held that the term "direct physical loss" required that the building premises suffer some sort of "alteration." The Indiana court in turn relied on a New York state appellate decision, *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 6–7, 751 N.Y.S.2d 4, 8 (N.Y. App. Div. 2002), which held that an insured's premises had not suffered a direct physical loss when access to the premises had been cut off by a

12

nearby construction accident—but the accident caused no alteration to the premises. Just so with the coronavirus shutdown orders and procedures that cut off access to businesses without directly altering the premises. *Indiana Repertory Theatre*, 180 N.E.3d at 410 (also citing *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1145 (8th Cir. 2021)). And, again, the Indiana appellate court pointed to the restoration period's time limits as a textual clue. Although the Indiana court did not cite *Sandy Point* for the proposition, the point was the same: the confinement of the restoration period as the time during which the premises is "repaired, rebuilt, or replaced" was another reason to limit coverage for losses to those that cause a "physical alteration or impact" to the premises. 180 N.E.3d at 410.

### 4. Iowa Law

Next, the Supreme Court of Iowa arrived at a similar conclusion in *Wakonda Club v. Selective Insurance Company of America*, 973 N.W.2d 545, 552–54 (Iowa 2022); *see also Jesse's Embers, LCC v. Western Agricultural Ins. Co.*, 973 N.W.2d 507, 510 (Iowa 2022) (applying *Wakonda Club* and also denying coverage under the Civil Authority provision). The insurance policy at issue there also defined business-income coverage as limited to loss caused by "direct physical loss" of property. *Wakonda Club*, 973 N.W.2d at 549. In interpreting the term for the first time in the context of commercial-property policy, the Iowa Supreme Court held that coverage is triggered if there is some "physical aspect to the loss of the property." *Id.* at 552. Although the state high court did not directly frame the definition as requiring a physical alteration to the property, the holding of *Wakonda Club* carried the same core meaning: the

"mere loss of use of property, without more, does not meet the requirement for a direct physical loss of property." *Id.* Even if an alleged "contamination" is the source of the loss, there still must be a contamination that is "physical in nature" as to the *property*—loss of *use* does not suffice. *Id.* This holding was consistent, the Iowa Supreme Court pointed out, with the reasoning of the Eighth Circuit decision that applied Iowa law to a pandemic-based business-income claim. *Id.* at 553 (citing *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1145 (8th Cir. 2021) (rejecting coverage, under Iowa law, pursuant to a policy provision that covered "direct loss" and that defined "loss" as "accidental physical loss")). Applying the definition to the alleged facts, *Wakonda Club* held that the lack of physical harm to the business premises meant that the insured's claim was, at bottom, a request for coverage for mere loss of use of property—and thus had to be rejected. *Wakonda Club*, 973 N.W.2d at 554.

### 5. Minnesota Law

There does not appear to be a directly applicable decision from the Supreme Court of Minnesota on the definition of direct physical loss. Having said that, the Eighth Circuit has thrice held, under Minnesota law, that the term "direct physical loss" requires more than loss of use of business premises in this specific context. First, in *Olmsted Medical center v. Continental Casualty Company*, 65 F.4th 1005, 1009 (8th Cir. 2023), the insurance policy there provided business-income coverage for "direct physical loss." The appellate court analogized the business interruption arising from the coronavirus to a prior case in which a factory sought coverage for losses caused by electrical-power outages. *Id.* (citing *Pentair, Inc. v. Am. Guarantee & Liab. Ins.*

*Co.*, 400 F.3d 613, 616 (8th Cir. 2005)). That prior case too applied Minnesota law, *see Pentair*, 400 F.3d at 614, 616, and held that the factory's mere inability to function did not qualify as a "direct physical loss," *id.* at 616. Although Minnesota appellate court opinions had allowed coverage for losses caused by contamination, *Pentair* distinguished those cases by emphasizing the need for a threshold finding (or, at the pleading stage, an allegation) that the contamination was itself physical. 400 F.3d at 616 (distinguishing *Sentinel Mgt. v. N.H. Ins. Co.*, 563 N.W.2d 296, 300 (Minn. App. Ct. 1997) (asbestos fibers); *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. App. Ct. 2001) (pesticide). In line with *Pentair*, the Eighth Circuit in *Olmsted Medical* likewise distinguished those same two appellate court cases on the same grounds, that is, the contamination in those cases "were permanent absent some intervention." *Olmsted Medical*, 65 F.4th at 1011.

The opinion also distinguished a Minnesota Supreme Court decision that was relied on by the insured. *Olmsted Medical*, 65 F.4th at 1011 (distinguishing *Marshal Produce Co. v. St. Paul Fire and Marine Ins. Co.*, 98 N.W.2d 280, 285–86 (Minn. 1959)). The Eighth Circuit explained that *Marshall Produce* involved an insurance policy that insured against "all loss or damage by fire," and thus did not present the question of interpreting the key term "physical." 65 F.4th at 1010–1011. Lastly, the Eighth Circuit pointed out, as the Seventh Circuit in *Sandy Point* and other courts had as well, that the time limit on restoration—the time to rebuild, repair, or replace—again suggested that the loss had to have some kind of "effect on the underlying property." *Id.* at 1012.  So *Olmsted Medical* concluded that the Minnesota

15

Supreme Court would not interpret direct physical loss to cover a loss that was caused only by the loss of use of the property. *Id.*

In addition to *Olmsted Medical*, the Eighth Circuit has two other times rejected overage for business-income loss due to the coronavirus. One decision predated *Olmsted Medical* and held (albeit with less discussion than *Olmsted Medical*) that, absent "some physicality to the loss," there was no direct physical loss to the property. *Torgerson Props., Inc. v. Cont'l Cas. Co.*, 38 F.4th 4, 6 (8th Cir. 2022) (citing *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021) (as noted above, *Oral Surgeons* applied Iowa law)).

The third case is *Armory Hospitality, LLC v. Philadelphia Indemnity Insurance Company*, 87 F.4th 928, 929–30 (8th Cir. 2023). The insured in *Armory Hospital* added one new argument, namely, that the policy there covered (as it does here) not just "damage to" property but also "loss of" property, and thus physical damage is not needed. *Id.* at 930. This Court too relied on that textual distinction in the earlier opinion. *See* R. 131 at 20, 22 (relying on disjunctive "or" and separate terms for "damage to" and "loss of"). But, in *Armory Hospital*, the Eighth Circuit reasoned that the distinction did not overcome the requirement that the loss still must involve "physicality." 87 F.4th at 930 (citing *Planet Sub Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 36 F.4th 772, 775–76 (8th Cir. 2022) (applying Kansas, Missouri, and Oklahoma law); *Monday Restaurants. v. Intrepid Ins. Co.*, 32 F.4th 656, 658 (8th Cir. 2022) (applying Missouri law). Because the pandemic-shutdown orders did not present a physical element, the insured had not suffered a loss caused by a direct physical loss.

All in all, then, even without a Minnesota Supreme Court decision directly on point, the uniform authority points in only one direction: direct physical loss requires more than mere loss of the use of property.

### 6. Tennessee Law

For the sixth and final State at issue, Tennessee, there do not appear to be directly applicable state court decisions. But there is at least one decision from each of the three federal district courts in that State holding that similar business-income provisions did not cover pandemic-shutdown losses under Tennessee law. In *SFDG LLC v. Cincinnati Insurance Company*, 558 F.Supp.3d 590, 594, 595–96 (E.D. Tenn. 2021), the Eastern District of Tennessee considered a business-income coverage provision that required "physical loss." After canvassing dictionary definitions for the meaning of "physical," the district court held that coverage was limited to "material, perceptible harm" to the insured property, "whether in whole or in part." *Id.* at 595. Put another way, there must be "some form of tangible harm" to the property for coverage to apply. *Id.* Like other cases discussed above, *SFDG* also relied on the restoration-period definition in the policy to delimit the meaning of "physical" loss. *Id.* at 596. The policy at issue there set the restoration time limit to when the premised was being "repaired, rebuilt, or replaced." *Id.* Those restoration-period terms, the court reasoned, suggest that there first must be a "tangible" harm to property that would need repair, rebuilding, or replacement. *Id.* Applied to the pandemic-shutdown orders, no "physical" loss had occurred given the absence of tangible harm to the insured property. *Id.* at 599.

Similarly, in *Creative Business, Inc. v. Covington Specialty Insurance Company*, 559 F.Supp.3d 660, 668–71 (W.D. Tenn. 2021), the Western District of Tennessee held that pandemic-shutdown and limitation orders did not cause a "direct physical loss," which was the operative phrase in the coverage provision. The district court first noted that a pre-pandemic decision of the Tennessee Court of Appeals suggested that "direct physical loss" requires "tangible damage or destruction" of the insured property. *Id.* at 668. Specifically, in *Great River Insurance Company v. Edison Automation, Inc.*, 2004 WL 892528, at *3 (Tenn. Ct. App. Apr. 23, 2004) (unpublished opinion), the Tennessee appellate court rejected coverage for insured property (there, electrical-control products) that had "suffered no damage, and no physical loss," and thus did not qualify as "direct physical loss." *Id.* at *1, *3. Applying that principle to the pandemic-shutdown orders, the district court in *Creative Business* held that the insured (a restaurant) had not suffered a "direct *tangible* impact" to its premises. 559 F.Supp.3d at 671 (emphasis added). Consistent with other state decisions discussed above, *Creative Business* also relied on the restoration-period definition, which said that the coverage ends when the premises should have been "repaired, rebuilt, or replaced." *Id.* at 667, 669. A repair or replacement would be needed "only after physical, tangible injury," which had not happened to the restaurant's premises. *Id.* at 669. The district court also rejected the insured's argument that "loss of" property had a broader meaning than "damage to" property, at least broader in the sense that physical damage to the property was not required. *Id.* at 670. *Creative Business* explained that accepting that proposition would be the near-equivalent of allowing

18

coverage for "purely economic losses," which was generally not allowed under coverage for direct physical loss. *Id.* So the pandemic-shutdown orders did not trigger coverage for the interruption of business income. *Id.* at 670–71.

The final example is from the Middle District of Tennessee and deployed similar reasoning in rejecting coverage. In *1210 McGavock St. Hospitality Partners, LLC v. Admiral Indemnity Company*, 509 F.Supp.3d 1032, 1042 (M.D. Tenn. 2020), the business-income coverage required a "direct physical loss" of property. *Id.* at 1041. The district court reasoned that although the insured had suffered economic loss, it had not alleged a direct physical loss. *Id.* at 1042. The opinion concluded that there must be a "physical alteration" of the insured property. *Id.* (citing *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F.Supp.3d 616, 623–24 (E.D. Pa. 2020) (applying Pennsylvania law)). And, again, the district court approvingly quoted and cited a case that relied on the restoration-period definition that turned on when the insured's premises was "repaired, rebuilt, or replaced." *Id.* at 1042. Although the opinion did not explicitly quote the restoration-period definition in the policy, presumably the text of the definition was the same or similar, because *1210 McGavock* reasoned that only if the "structure" of a premises were to be "affect[ed]" would there be a need to repair, rebuild, or replace. *Id.* The district court also rejected the proffered distinction between "loss of" property and "damage to" property, because both clauses still required more than just "economic" loss. *Id.* at 1042–43. The pandemic-suspension orders in Tennessee did not cause a direct physical loss of property, so the business-income coverage did not apply. *Id.* at 1043. With these cases on the books, and no

Tennessee authority—whether federal court or state court—pointing the other way, the better prediction is that the Tennessee Supreme Court would apply the ordinary-meaning principle that applies to insurance-coverage questions, *see Travelers Indem. Co. of Am. V. Moore & Assocs., Inc.*, 216 S.W.3d 302, 306 (Tenn. 2007), the same way as *SFDG*, *Creative Business*, and *1210 McGavock*.

Against all this, the Plaintiffs point to the very few cases going the other way, most prominently the Vermont Supreme Court's decision in *Huntington Ingalls Industries, Inc. v. Ace American Insurance Company*, 287 A.3d 515, 532–35 (Vt. 2022). In that case, the Vermont high court interpreted the policy's coverage for "direct physical damage" to require "a distinct, demonstrable, physical change to property." *Id.* at 533. The distinct category of "direct physical loss" "means persistent destruction or deprivation, in whole or in part, with a causal nexus to a physical event or condition." *Id.* But rather than decide how "direct physical loss" might (or might not) apply to losses caused by the pandemic, *Huntington Ingalls* instead focused on coverage for "direct physical damage." *Id.* at 533–34. In the state supreme court's view, the virus' continued presence at the insured's business premises (a shipyard) and the virus' adherence to surfaces at the premises were sufficient to qualify as an "alteration" of the property. *Id.* at 534. That type of alteration was enough, the Vermont Supreme Court held, to qualify as direct physical damage. *Id.*

But the persuasive force of *Huntington Ingalls* is largely drained by the starkly light touch applied at the pleading stage under Vermont procedural law. Indeed, the Vermont Supreme Court emphasized that it was "important" to explain that the

pleading stage is just to get the case started, so Vermont had adopted an "extremely liberal" notice-pleading standard. 287 A.3d at 533 (quoting *Mahoney v. Tara, LLC*, 107 A.3d 887, 892 (Vt. 2014)). The result is an "exceedingly low" threshold to move the case forward. *Huntington Ingalls*, 287 A.3d at 533 (quotation omitted). In some contrast, Civil Rule 8(a) demands "sufficient *factual* matter," which if accepted as true, would state a plausible claim. *Iqbal*, 556 U.S. at 678 (emphasis added). So the Vermont Supreme Court set a very low bar, as a procedural matter, to surviving the motion for judgment on the pleadings.

Just as importantly, as a substantive matter, *Huntington Ingalls* simply does not align (as this Court's prior decision does not) with the overwhelming weight of authority at this point. As detailed earlier in this Opinion, the uniform case law in the pertinent jurisdictions requires that both direct "physical" loss of property or direct "physical" damage to property requires a physical *alteration* to property beyond what *Huntington Ingalls* sets. The Vermont Supreme Court deemed the fact that the virus "adheres" to surfaces to be enough to qualify as alteration. 287 A.3d at 533–34. But nothing in the case law described above suggests that adherence to surfaces causes the type of physical alteration—rather than adherence at the "microscopic level," *id.* at 534—required for coverage. Instead, even allowing that some forms of contamination might qualify as direct physical loss or damage, the contamination would require some "physical aspect to the loss of the property." *E.g., Wakonda Club*, 973 N.W.2d at 552. Without that physical aspect to the *loss* of property—rather than the just adherence to the property's surfaces—the insured is at bottom asking for loss

21

of *use* of the property. That is a purely economic loss, which even *Huntington Ingalls* recognizes as insufficient to trigger coverage for physical damage (or physical loss). 287 A.3d at 526, 530, 533. So even for those States in which the state supreme court has not spoken, the weight of authority clearly would disagree with the proposition that the virus' adherence to a surface is enough to qualify as direct physical loss. And, of course, the state high courts of Wisconsin and Iowa have spoken. *Colectivo Coffee Roasters, Inc. v. Society Insurance*, 401 Wis.2d, 660, 671–74, 974 N.W.2d 442, 447–449 (2022); *Wakonda Club v. Selective Insurance Company of America*, 973 N.W.2d 545, 552–54 (Iowa 2022). Plus, the Seventh Circuit has made its binding (as to lower federal courts in the circuit) prediction on Illinois law. *Sandy Point Dental, P.C. v. Cincinnati Insurance Company*, 20 F.4th 327, 331–34 (7th Cir. 2021). As a matter of law, there is no coverage under the Business Income provision based on the interruption of the insureds' operations caused by the pandemic.

### III. Conclusion

Society's renewed motions to dismiss and for summary judgment are now granted also as to the claims for Business Income coverage (and, concomitantly, as to the claims under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155). With the previous dismissals and summary judgment decisions against coverage under the Civil Authority and the Contamination provisions (in the *Big Onion* and *Valley Lodge* actions), and against coverage under the Sue and Labor clause (in the *Rising Dough* case), all coverage theories have been rejected. The uniformity of the policy text

requires dismissal of the claims in the Master Consolidated Amended Complaint and the actions assigned to this MDL. Final judgment shall be entered.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: July 30, 2025